### HAYDEN v. UNITED STATES.
### No. 6073.

Circuit Court of Appeals, Ninth Circuit.

June 20, 1930.

Long & Hammer, of Seattle, Wash., for appellant.

Anthony Savage, U. S. Atty., and Tom De Wolfe, Asst. U. S. Atty., and Lester E. Pope,

Regional Atty., U. S. Veterans' Bureau, all of Seattle, Wash.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

DIETRICH, Circuit Judge.

This action was brought to recover on a war-risk insurance policy. At the close of plaintiff's evidence the court granted defendant's motion for a nonsuit, and this ruling is the basis for the principal assignment of error.

It is admitted that plaintiff enlisted in the United States Army on September 19, 1917, and was honorably discharged on June 6, 1919; that insurance in the amount of $10,000, payable in monthly installments of $57.50, was granted to him on December 3, 1917, conditioned upon his death or permanent and total disability occurring while the contract was in force; that premiums were paid on the policy up to and including the month of June, 1919; and that, unless total and permanent disability theretofore existed, the contract lapsed for nonpayment of the premium due July 1, 1919. While in line of duty plaintiff was gassed in July, 1918, and on October 5, 1918, he was wounded by an explosive shell; and from the injury received on the latter date, it cannot be doubted, some measure of disability of a permanent character resulted.

It is well understood the coverage of such policies extends only to cases of death or "total permanent disability," and by departmental regulation promulgated pursuant to statutory authority, total disability is defined as "any impairment of mind or body which renders it impossible for the disabled person to follow continuously any substantially gainful occupation." The one real issue, therefore, was whether prior to July 1, 1919, there was such impairment of plaintiff's mind or body that he was unable to follow continuously some substantially gainful occupation.

In substance, the plaintiff testified that, after being struck with a piece of high explosive shell, he lay on the field a day before he was picked up; he was then sent back to New York, and from there to Camp Lewis, and was in the hospital all the time until the date of his discharge; he did not work after he went home, and was weak and had slight pains in his legs and back, which graudnally disappeared; in a short time he was called to the Veterans' Bureau and given an examination, and in due course received disability compensation; he continued to suffer some pain in his legs, and was weak and able to walk fairly well, but at all times he was in a nervous state. In the latter part of 1919, under the direction of the government, he endeavored to receive training in the light substation of Seattle, but all he did there was to sit in an easy chair and try to learn about the switches; he was then transferred to the Y. M. C. A. for training as a wireless operator, and he stayed there three or four months but did no work—just attended classes. Under direction of government officers he was then sent to a business college to train for postal clerk; that was in June or July, 1920. In 1921 he took examination for postal clerk and tried out the service for a few hours at a time, two or three hours in the evening; he estimated that during the year 1921 he put in in the aggregate two or three months in that way. During that period he felt quite well, but sometimes not very good; his legs would get numb, and he would go home and recuperate a bit. If he walked too much, he was in more pain; working affected his condition, particularly his legs—they got numb and painful. During the Christmas rush of 1921 at the post office he worked three or four or five days; he did not feel as well after that week's work. About January, 1922, the Veterans' Bureau called him in for examination, and he was sent to a hospital, where he remained for a month, and then went home. In May of that year he got an appointment as substitute clerk in the post office. He observed that the more he worked the worse he got; he quit on June 15th and went to the Veterans' Bureau the following day, whereupon he was sent to another hospital. After three days in this hospital he completely collapsed, and on June 29, 1922, he was sent to Portland, Or., as a stretcher case. At Portland he remained until August 9, 1923, most of the time in bed. Since August, 1923, he has done no work at all. His condition has been very poor, numbness from the waist down, not very good use of his legs, sort of weak and nervous; he could hardly walk more than two or three blocks from home. There has been no time since his discharge that he has been free from pain or from nervousness, and no time that he could concentrate upon his work to any degree; he did his best in attempting to work at the post office.

Such is the substance of his testimony on direct examination. While on cross-examination he did not greatly qualify his direct testimony, he exhibited some disposition to be evasive and to decline to remember or to answer specific questions put to him as to how

long he worked at different periods or just how much time he put in in the different training schools. To a slight degree his testimony was corroborated by that of his brother and of his mother.

From the record of the Veterans' Bureau, which he introduced, it appeared that by that Bureau his disability was rated as temporary partial, 20 per cent., from date of separation from active service to April 28, 1921, temporary partial, 10 per cent., from April 28, 1921, to January 6, 1922, total temporary from January 6, 1922, to January 30, 1922, temporary partial, 10 per cent., from January 30, 1922, to June 16, 1922, permanent total from June, 1922, to the date of the trial, the ratings of disability being on account of transverse myelitis, that is, according to the testimony of the regional manager of the Veterans' Bureau, "on account of the gunshot wound and the transverse myelitis and made as a result of examination of the doctors of the Veterans' Bureau."

Plaintiff also offered the testimony of a physician as to the results of an examination made by him on October 8, 1929, a few days before the trial, prior to which date he had never seen the plaintiff; he stated that he found the plaintiff suffering from transverse myelitis, which means a lesion of the spinal cord, which more or less paralyzes some muscles, and some sensations below the point of lesion. In his view, the piece of shell by which plaintiff was wounded entered the back about the level of the second lumbar vertebra, and evidently destroyed more or less of the nerve tissues. He found an area of supersensitiveness about the lesion, as is common in such cases; plaintiff was unable to walk well, he dragged his left foot; there was a loss of sensation to pin pricks which was practically total in the right thigh, and a loss of ability to distinguish between heat and cold in the entire right leg and thigh; in the left leg there was not so much loss of sensation but greater disability; the muscles of this leg are paralyzed; he found a difference of an inch and a quarter in the size of the thighs, the left one being smaller than the right, and that was because of the paralysis of the muscles of the left leg; the muscles had wasted away to a certain extent, but there was still some use of the left leg; there was a scar on the front of the abdomen which is sensitive because of the nerve in the scar, "which was made at the time the shell was extracted." There was some inflammation of the bladder. Explaining the disclosures made by the X-ray of the spine, he testified

that the piece of shell must have been going downward and inward when it hit, and the injury was to the transverse process; "there must have been a tearing of the nerves and a considerable hemorrhage in there; when that sort of thing hit his spine there was more or less of an explosive effect inside of the spinal canal, and hemorrhage, with pressure on that spine, caused great damage to the spinal cord; the skin is very sensitive to the touch, to any little irritation above the point of injury, and that is practically always present in injuries to the spinal cord; the condition that I found in this man is a constant source of irritation, and makes the person nervous and his nerves are unstable; there is bound to be pain; in an inner lesion like that there is scar formation which must press on nerves, and the pressure must cause pain; there might be pain in any part of the body to which those nerves radiate; it would be practically impossible for him to concentrate or study; it would be impossible for him to engage in physical exertion, because he cannot use his legs sufficiently to do anything requiring it; if he used his arms or any part of his body he would gradually go downward; he would not last any time, one or two days would probably be his limit on any steady occupation; in my opinion the same result would follow any occupation involving mental effort; in my opinion he will never be well."

It is true this examination was made more than ten years after plaintiff was wounded, but, when the diagnosis is considered in the light of the history of the case as disclosed by the testimony of the plaintiff and members of his family, and further in the light of the fact that from the beginning the Veterans' Bureau rated plaintiff continuously as either partially or totally disabled and the final rating of total disability in June, 1922, we cannot say that the physician's testimony is without probative value in tending to establish that in fact the total disability related back to the date he was shot. For present purposes we must credit the plaintiff's testimony to the effect that never after being wounded did he follow continuously any substantially gainful occupation, and we think it is a question for the jury whether his conduct in that respect was due to disability or unwillingness or some other cause. True, some of the Bureau's ratings are opposed to the theory of total disability, but some of them are also opposed to the theory of permanent disability, about which now in the light of developments there is no longer any question. The ratings may create a

conflict in the evidence, but certainly they are not conclusive.

In the brief for the government, great weight seems to be attached to a paper introduced by it as an exhibit on cross-examination of the plaintiff, which is headed, "Medical Certificate, Post Office Service," and is dated January 22, 1921. Apparently at that time plaintiff was seeking employment in the Postal Department, or the Veterans' Bureau was endeavoring to get him into that service. The document is a printed form, at the head of which it is stated to be a certificate required of all eligibles for the post office service and that a selection cannot be approved if the medical certificate discloses any physical unfitness for the service; there are numerous questions, all of which are to be answered by the physician and not by the applicant. True, the plaintiff's name is signed, but he certified to nothing, and the physician certified that he made the examination and that all the answers were in his handwriting. A few of the answers are inconsistent with the contention now made by the plaintiff that at that time he was under total disability. But we need not enter into discussion of the question of how far plaintiff is chargeable with responsibility for such answers, for in any view the answers could not be regarded as conclusive. In so far as they are inconsistent with his present claim and testimony, they constitute matter in the nature of impeachment only, and would not warrant the granting of a nonsuit. Like comment may be made upon the suggestion that evidently plaintiff did not think he was totally and permanently disabled or he would not have waited ten years to assert a right under the policy. These are all considerations for the jury.

Upon the whole it is thought there was sufficient evidence to go to the jury, and accordingly the judgment is reversed.