## BARKSDALE v. UNITED STATES.
### No. 302.

Circuit Court of Appeals, Tenth Circuit.
Jan. 5, 1931.

S. R. Owens, of Denver, Colo. (Joseph P. O'Connell, of Denver, Colo., of counsel), for appellant.

Ralph L. Carr, U. S. Atty., of Denver, Colo., John G. Reid, Asst. U. S. Atty., of Hugo, Colo., and William Wolff Smith, Gen. Counsel, U. S. Veterans' Bureau, and Bayless L. Guffy, both of Washington, D. C., and Richard A. Toomey, of Denver, Colo., Atty., Veterans' Bureau.

Before PHILLIPS and McDERMOTT, Circuit Judges, and POLLOCK, District Judge.

POLLOCK, District Judge.

This action was brought by plaintiff, Leslie Barksdale, to recover on a reinstated contract of war-risk insurance. It is alleged in the petition that this contract of insurance was in full force and effect on January 31, 1921; that on or before that date plaintiff had become and was totally and permanently disabled from following any gainful occupation or employment. The trial was had before the court and a jury. At the close of the evidence for plaintiff, the court, on motion of the defendant, directed a verdict in its favor. The correctness of this ruling constitutes the single ground of error complained of on this appeal.

The question presented by this record was this: Did the evidence produced by the plaintiff on the trial tend to show on or before January 31, 1921, plaintiff had, from any impairment of his mind or body, become permanently and totally disabled from following continuously any substantially gainful occupation? As the ruling on this question was made at the conclusion of plaintiff's evidence, and not at the conclusion of all the evidence in the case, all that was brought before the trial court was, Did the evidence adduced by plaintiff make out a prima facie case in his behalf? A review of this evidence found in the record shows as follows:

That he was suffering from a skin disease known as onychia, which caused an enlargement or thickening of the finger nails and toe nails, and a chafed condition of the face and hands; that he was also suffering from brachial neuritis of the left arm and shoulder, resulting in a wasting of the muscles of the left arm and shoulder and a weakening of the left hand and arm; that the onychia had existed since 1917 and was incurable; that the condition of the left arm and shoulder had existed since 1917 and was growing worse.

Plaintiff further testified that he served in the army from June 24, 1916, until April 12, 1919; that while in the service he suffered an attack of "flu," which left him with a throat and lung affection, from which he had not fully recovered; that he enlisted in the Marines on May 26, 1919, and was discharged on account of disability July 15, 1919; that he then went back to his home in Memphis, Tenn. and secured employment with the Lytile Electrical Company of Memphis, for which he continued to work for about six or eight months, and due to illness he was unable to work more than two days out of three; that he went to the Veterans' Bureau Hospital at Alexandria, La., and remained in the hospital from May 10, 1920, to April 23, 1921; during that period he was operated upon three times, once for hernia, once for the removal of his tonsils, and once for the removal of his appendix; that after his discharge from that hospital he returned to his home in Memphis, and then went to Pascagoula, Miss., and entered vocational training; that he remained there in training from June 8, 1921, until July of that year; about July 20, 1921, he went to the hospital at Johnson City, Tenn., having been sent there by the Veterans' Bureau for treatment of jaundice and also for treatment of lung and stomach conditions; that he left Johnson City April 21, 1922, and came to Las Cruces, N. M., for treatment for lung trouble and for vocational training; he remained at Las Cruces about three months, and was then sent to Denver; he remained in vocational training about two months, and was then transferred to Northern Wyoming for further vocational training; during his stay in Wyoming he was ill about half of the time, and on May 10, 1923, he was transferred to Fitzsimons General Hospital at Denver, and remained there until March 3, 1925, where he was treated for stomach and skin conditions; he was transferred from Fitzsimons General Hospital in 1925 to the Walter Reid Hospital in Washington, D. C., and stayed there until November 2, 1925; that he was again transferred back to Denver for vocational training, and stayed in training about four months; that he was then transferred again to the Fitzsimons Hospital, from which he was discharged in September, 1928. During the time he was in the Fitzsimons Hospital he underwent an operation for the removal of his gall bladder.

And he further testified that his left arm and shoulder ailment had existed since 1917, that he could not raise his left arm over his head, and that he suffered pain in the region of the left arm and shoulder. He further testified they reinstated his policy of war-risk term insurance in June, 1921, while being hospitalized at Alexandria, La., and he stated in his application for reinstatement he was then in as good health as when he was discharged from the army, and also stated that he was not claiming total and permanent disability prior to 1921.

The plaintiff also produced a number of medical witnesses, Dr. Earl H. Bruns, a lieutenant colonel in the Medical Corps of the United States Army, who examined plaintiff in 1923, and saw him many times between 1921 and 1926. Dr. Bruns stated that plaintiff's only disability was the neuritis in the left shoulder and arm and the onychia. Dr. Shannon L. Van Valzah, a major in the United States Army Medical Corps, testified that he examined plaintiff on various occasions following 1926, and that plaintiff was suffering from onychia and the neuritis in the left arm and shoulder, and that his chances for recovery were nil. Dr. L. H. Winemiller, a physician employed by the United States Veterans' Bureau, testified that he had seen the plaintiff at various times between 1923 and 1928, and that he had not made a careful examination of the plaintiff; that the only ailment he had observed was the condition of his hands. Dr. Partington, a physician specializing in nervous and mental diseases, testified he examined plaintiff in 1922. He testified there was nothing in plaintiff's condition at the time he examined him in 1922 that would prevent plaintiff from continuously following some substantially gainful occupation. Dr. Bruns testified in his opinion plaintiff could follow the occupation of poultry or electrical salesman, although the doctor admitted it was very hard for plaintiff to compete with other men on account of his face, hands, and finger nails. The medical evidence was to the effect that, while the plaintiff had a vocational handicap, he could continue to follow some substantially gainful occupation. On the other hand, the testimony of plaintiff was that, while he had made efforts to do so, he has not been able to continually follow a substantially gainful occupation since May 10, 1920.

The effect of all this expert medical evidence, briefly summed up, would probably be about this: While at one time plaintiff may have been permanently and totally disabled from following continuously any substantial gainful employment, yet, as a result of hospitalization treatment and surgery, he

had practically recovered, and it was now possible he was not permanently and totally disabled. However this may be, the jury might well have been inclined to take the positive evidence of the plaintiff to the opinion of the medical men which he called in his behalf. Medical men indulge, very generally, in theorizing on the affairs of life, while the living of life is a very practical affair. What it is possible for one man to do is utterly impossible for another to perform, though apparently both are in the same mental and physical condition. The government inducted boys into the miitary branch of our country to meet the exigencies of affairs under which Europe suffered ·without perhaps much thought of their mental power or physical equipment so long as they did not seem to be disqualified. Being in the service, they were granted contracts of insurance on quite reasonable terms, the government and all others knowing full well when it came to a question whether the policy issued to a certain individual had matured under the terms of the contract the question at issue would be whether the particular individual insured, and bringing the action on a particular policy, taking into account the low order of his mentality or his inexperience in the different affairs of life, could follow continuously some gainful occupation in life; that is to say, to make a living for himself and those dependent upon him, even if the only possible occupation open to him was hard manual labor or menial service. It is true, the evidence shows that, after the date at which the plaintiff claims to have become permanently and totally disabled, he did perform some labor, but this neither shows, nor tends to show, he could perform such labor continuously. The energy and ambition of the person must be called into effect. The energy and ambition of plaintiff may have compelled him to try the labor he undertook, although at the time he was absolutely unable to perform the labor undertaken either temporarily or continuously.

On this branch of the case we cite· with approval the recent opinion written by Judge Kenyon of the Circuit Court of Appeal, Eighth Circuit, in United States v. Phillips, 44 F.(2d) 689.

We are of the opinion, notwithstanding the medical testimony and the fact plaintiff did attempt to work as shown by the evidence after he claims to have been totally and permanently disabled,· yet it was still a question of fact for the jury whether in his condition he could have continuously performed any gainful occupation which it was possible for him to procure and perform in order that he might earn a living for himself and those, if any, dependent upon him for support.

It follows the case should have been submitted to the jury, and the order of the trial court sustaining the demurrer to the evidence was error. Reversed.

It is so ordered.