## STOREY v. UNITED STATES.
### No. 604.

Circuit Court of Appeals, Tenth Circuit.
July 18, 1932.

Lewis A. Hasty, of Wichita, Kan., for appellant.

C. L. Dawson, of Washington, D. C., Atty., Veterans' Administration (S. M. Brewster, U. S. Atty., and L. E. Wyman, Asst. U. S. Atty., both of Topeka, Kan., and William Wolff Smith, of Washington, D. C., Sp. Counsel, Veterans' Administration, on the brief), for the United States.

Before COTTERAL, PHILLIPS, and McDERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge.

The plaintiff below, a mechanic by trade, enlisted in the United States Army on December 15, 1917. His policy of war risk insurance lapsed on December 1, 1918 unless it matured prior to that date. Claiming to have been permanently and totally disabled prior to December 1, 1918, the plaintiff filed this action. The case was tried without a jury, and, at the close of plaintiff's evidence, the government moved for judgment on the ground that the plaintiff had failed to prove by any evidence in the case that he was permanently and totally disabled while the policy was in force. This motion was sustained. This appeal presents the question of whether plaintiff's proof disclosed such substantial evidence of permanent and total disability as would support a judgment in his favor.

The plaintiff was on active duty from the time of his enlistment until March 17, 1918, when he was ordered to a base hospital on account of severe pains in his back, right hip, and leg. Excepting for a few days in April, he was in army hospitals from that date until his discharge by a surgeon's certificate of disability, on October 2, 1918. During that

period he was examined by many doctors, and the diagnosis and treatment were repeatedly changed in an effort to afford him relief. Medication, massage, X-ray, electrical treatments, and serum injections were resorted to; for one period of 35 days he was in a plaster cast from his ankles to his armpits. Opiates and sedatives were resorted to in order to induce sleep. His legs drew up and his spine curved; he submitted to an operation, described by the surgeon's report as an "operation double plastic spica consuming thirty minutes time without anæsthetic by four doctors." But all the medical skill at the disposal of the government could not relieve him; in September the doctors recorded: "Forward bending practically impossible * * * no improvement." The difficulty centered in the sacroiliac joint; the disease was a progressive one which later involved the spine, and which eventually resulted in the obliteration of the joint and an ankylosis of the vertebræ. The plaintiff testified to the circumstances of his discharge as follows: "After about six weeks of these treatments, Doctor Willson came to my bed and told me that the treatment they had been giving me did not seem to benefit me very much and they had come to the conclusion that time was the only thing that would decide my case, and he wanted to know how I would like to go home. I told him I did not want to go home in the condition I was in as I was bedridden and not able to walk without crutches. He insisted the change of climate would benefit me and that he had recommended my discharge. On October 2, 1918, I was discharged and sent home by way of pullman, with a United States Hospital attendant, as I was unable to walk without the aid of crutches."

A board of medical officers rated the plaintiff, taken from a hospital bed and sent home on crutches with an attendant, as two-sixteenths disabled.

By March, 1919, the plaintiff "managed to walk without the aid of crutches," although still suffering severe pains in his back. The government awarded him $4.40 a month compensation; he sought and secured from a personal friend employment at a motor company, performing such light work as his physical condition would permit. He held this position for 14 months; during that period he was compelled to lay off on account of illness more than a dozen times, one lay-off being for four weeks. At other times he was compelled to quit in the middle of the afternoon, or to lie down and rest during working hours. He was off on account of his disability nearly a

fourth of the time. His total wages, as a skilled mechanic, for 14 months, were $1,434.75, a fact which throws a significant light upon the breaks in the continuity of his employment. He gave up the position on account of his physical inability to hold it. In August, 1920, he secured another position as a shop foreman which he held for four or five months. During this period he was off duty frequently, and again he was compelled to give up the position on account of his disability. From 1920 until 1929 he did no work. In 1929 he secured employment from a personal friend, answering inquiries at a road information desk at an automobile supply company, which involved no physical effort. He was paid at the rate of $75 a month when he worked, but he lost more than half of his time on account of his disability, and was finally forced to give up this position.

Space permits of a summary only of his later medical record. From the date of his discharge until May, 1919, he called no physician, because, as he testified, his Army experience taught him that relief could be had only by complete rest and the application of heat.

From May, 1919, to August, 1920, treated at his home by Dr. Crank.

From December, 1920, until 1923, treated by Dr. Purvis, an orthopedic surgeon of the Veterans' Bureau, and by Dr. Grage, a private physician.

June 8, 1921, a part of shin bone grafted in his spine. In government hospital three months following operation.

February, 1922, another operation removing part of graft from spine and draining pus pocket. In hospital three months. When discharged, unable to walk to any advantage.

January, 1923, back in hospital; another operation, removing balance of graft from spine. In plaster cast 30 days. In hospital three months.

May, 1924, until August, 1924, in hospital.

October, 1924, until January, 1925, in hospital.

November, 1926, sent to government hospital at Muskogee; stayed three weeks.

April to August, 1927, bedfast.

During these years, he wore such body braces, or belts, or jackets, as were prescribed from time to time by the government physicians. During the intervals between hospitalizations, he was under treatment by government or private physicians, or both.

Dr. Purvis, a government physician, tes-

tified that he considered him to be permanently and totally disabled in 1923. There was competent medical evidence that it was not possible for the plaintiff to follow continuously a substantially gainful occupation, involving physical effort, since his discharge from the Army.

When discharged from the Army, the plaintiff was on crutches, and a hospital attendant was required to enable him to return to his home. That he was then totally disabled is not open to dispute. The remaining question is, Was his condition permanent; or, to use the language of the governing regulation, was his disability "founded upon conditions which render it reasonably certain that it will continue throughout the life of the person suffering from it?" The disease from which plaintiff suffered is a progressive disease. It is conceded by the government that the insured is now permanently and totally disabled. Plaintiff's proof discloses no permanent improvement in his condition—no arrest of the disease—between the time of his discharge and the time of the trial. Plaintiff co-operated with the medical staffs to the fullest extent; he submitted to every suggestion of the government physicians; he has undergone four operations; twice his body has been incased in plaster casts for many weeks; he has submitted to the physical discomfort of every body brace or belt that has been suggested. It is not too much to say that his disability has baffled all the medical skill which the government could muster.

To meet this formidable proof, the government makes three contentions. It relies upon the finding of a medical board that he was only two-sixteenths disabled at the time of his discharge. Yet he was discharged because he was physically unable to be of any service in the armed forces of the nation. While such a certificate is not conclusive of the degree of disability, it has an evidentiary bearing, for a great army has need of clerks, orderlies, cooks, and mechanics, as well as soldiers with rifles. But there was no niche for plaintiff in his condition; he was discharged because there was no task connected with the Army which he was physically able to perform. He was discharged from a hospital bed; sent home on crutches, with an attendant for the journey. We do not understand how it is possible to rate one in such a condition as two-sixteenths disabled. Under these circumstances, the rule is applicable that, "when the testimony of a witness is positively contradicted by the physical facts,

neither the court nor the jury can be permitted to credit it." Woolworth Co. v. Davis (C. C. A. 10) 41 F.(2d) 342, 347; American Car & Foundry Co. v. Kindermann (C. C. A. 8) 216 F. 499, 502; Missouri K. & T. R. Co. v. Collier (C. C. A. 8) 157 F. 347, certiorari denied 209 U. S. 545, 28 S. Ct. 571, 52 L. Ed. 920.

The government then contends that the fact of his employment negatives the possibility of a total disability. On that subject, this court has said:

"It has also been held that the totality of the disability is not conclusively disproven by the fact that the insured was employed for a period after the policy lapsed. United States v. Eliasson (C. C. A. 9) 20 F.(2d) 821; United States v. Cox (C. C. A. 5) 24 F.(2d) 944; United States v. Sligh (C. C. A. 9) 31 F.(2d) 735; United States v. Acker (C. C. A. 5) 35 F.(2d) 646; Hayden v. United States (C. C. A. 9) 41 F.(2d) 614; Malavski v. United States (C. C. A. 7) 43 F.(2d) 974; United States v. Meserve (C. C. A. 9) 44 F.(2d) 549; United States v. Phillips (C. C. A. 8) 44 F.(2d) 689; Ford v. United States (C. C. A. 1) 44 F.(2d) 754; United States v. Cole (C. C. A. 6) 45 F.(2d) 339; United States v. Rasar (C. C. A. 9) 45 F. (2d) 545; United States v. Godfrey (C. C. A. 1) 47 F.(2d) 126; Carter v. United States (C. C. A. 4) 49 F.(2d) 221. Back of these authorities are two reasons: The regulation reads that it must be 'impossible' to follow 'continuously' any substantially gainful occupation. An insured who is able to work only spasmodically, with frequent interruptions or change of jobs made necessary by his condition, cannot be said to be able to work with substantial continuity. Again, the word 'impossible' must be given a rational meaning; it cannot fairly be said that it is 'possible' for an insured to work because, under the stimulus of a strong will power, it is physically possible for him to stick to a task, if the work is done at the risk of substantially aggravating his condition. United States v. Acker (C. C. A. 5) 35 F.(2d) 646; United States v. Phillips (C. C. A. 8) 44 F.(2d) 689; United States v. Cole (C. C. A. 6) 45 F.(2d) 339.

"Like any other question of fact, the subsequent employment may be of such duration, and be of such a nature, that it conclusively refutes any idea that the insured might have been permanently and totally disabled prior to and during the employment. United States v. Barker (C. C. A. 9) 36 F. (2d) 556; United States v. Rice (C. C. A. 9)

47 F.(2d) 749; United States v. Harrison (C. C. A. 4) 49 F.(2d) 227; United States v. Le Duc (C. C. A. 8) 48 F.(2d) 789; Ross v. United States (C. C. A. 5) 49 F.(2d) 541." Nicolay v. United States (C. C. A.) 51 F. (2d) 170, 172, 173.

It cannot be said that the employment of the plaintiff conclusively refutes his claim of permanent and total disability. On the contrary, the evidence in this respect tends to corroborate, rather than contradict, the claim of disability. The record does not disclose that the plaintiff was able to follow continuously a substantially gainful occupation; it discloses that, although he tried, he was unable to. During his first period of employment, he was forced to lay off more than a dozen times in fourteen months, a total of almost one-fourth of the time; he lost the position because he was physically unable to continue. His second employment was even of shorter duration, and was given up for the same reason. After nine years of medical treatment, he then undertook to hold an insignificant position at a road information bureau; yet his physical condition was such that more than half the time he was not able to do even that light work. This record is not one of ordinary interruptions of employment to which the average worker is subjected. Rather it is a record of a determined but unsuccessful effort to hold a job. The question is not whether plaintiff did any work; the question is, Could he, with reasonable continuity, follow a vocation for which he was fitted, without serious peril to his life or health? United States v. Perry (C. C. A. 8) 55 F.(2d) 819; Carter v. United States (C. C. A. 4) 49 F.(2d) 221; United States v. Phillips (C. C. A. 8) 44 F.(2d) 689; Ford v. United States (C. C. A. 1) 44 F.(2d) 754; United States v. Sligh (C. C. A. 9) 31 F.(2d) 735; United States v. Eliasson (C. C. A. 9) 20 F.(2d) 821. Certainly it cannot be said that there is here conclusive proof of his ability to follow "continuously" a substantially gainful occupation.

The government then relies upon the evidence of a physician, called by the plaintiff, to the effect that the plaintiff was physically able to have done the work of a court reporter, and that he could do such mechanical work as could be done sitting in a chair. The same witness testified that he was not in physical condition "to do any work unless it were some little sitting work or resting." He also testified that his condition required plenty of rest and sunshine. Another doctor testified that he knew persons, suffering from ankylosis of the spine, who carried on their daily work.

The record discloses no occupation which requires only "some little sitting work or resting," and which affords the abundance of rest and sunshine prescribed by the same witness; and we know of none. Nor can it be said that one whose physical condition requires frequent and extended confinements to hospitals or to bed is able continuously to follow any occupation. Nor is there merit in the contention that others with similar disabilities might do court reporting. In the first place, a court reporter's work cannot be subjected to the frequent and extended interruptions disclosed by the history of this case; again, the government insured the soldiers as it found them. If a man equipped by nature for physical labor only is accepted by the government for military service and insured, and is disabled from doing work for which he is equipped, it is no answer to suggest that a university graduate, with a similar disability, could practice law. Nicolay v. United States (C. C. A. 10) 51 F.(2d) 170; Barksdale v. United States (C. C. A. 10) 46 F.(2d) 762; United States v. Cox (C. C. A. 5) 24 F.(2d) 944; United States v. Rasar (C. C. A. 9) 45 F.(2d) 545; Prochel v. United States (C. C. A. 8) 59 F.(2d) 648.

We conclude that the record discloses substantial evidence to support a verdict for the plaintiff. Indeed, if the plaintiff's evidence is not disputed, a serious question would be presented as to whether he would be entitled to a directed verdict.

It follows that the judgment should be reversed and the case remanded for a new trial.

Reversed and remanded.