## RACKOFF v. UNITED STATES.
### No. 189.

Circuit Court of Appeals, Second Circuit.
Jan. 7, 1935.

Martin Conboy, U. S. Atty., of New York City (Thomas McCall and Francis H. Horan, Asst. U. S. Attys., both of New York City, of counsel), for the United States.

Thomas H. Greene, of New York City, for appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is an action to recover upon a policy of war risk insurance of which Henry Cudmore, a soldier in the military service of the United States, was the beneficiary. He entered the service on August 5, 1918, at the age of 26 years, and was honorably discharged February 14, 1919. The policy expired on March 31, 1919, because of nonpayment of premiums. On January 24, 1921, Cudmore was committed to an insane asylum, as suffering from dementia præcox, and since then has been an inmate of hospitals for the insane. His committee brought this action on January 30, 1932. Upon the trial the jury rendered a verdict for the plaintiff, and a judgment was entered thereon from which this appeal was taken. The question before us is whether there was sufficient evidence to justify a jury in reaching the conclusion that Cudmore was totally and permanently disabled while the policy was in force. In our opinion the evidence was sufficient.

Total disability is such impairment of mind or body as renders it impossible for the insured to engage continuously, that is, with reasonable regularity, in any substantially gainful occupation, and total disability is permanent if it is founded upon conditions that make it reasonably certain that it will continue throughout life.

The issue for the jury to determine was whether Cudmore was totally and permanently disabled within the foregoing definitions on or before March 31, 1919, when the policy expired. He was inducted into the army on August 5, 1918, but, because he was underweight, only for special or limited service. In September, 1918, he and his company were ordered to Camp Merritt, N. J., and subjected to military training in the way of marching and drilling.

Edward Cudmore, the brother of Henry Cudmore, testified that late in October, 1918, in response to a call, he went with his mother to Camp Merritt to see Henry, and found him in bed in a ward in the military hospital; that just after they got there they saw a physician pull out a hypodermic needle from the middle of Henry's back, hold it up to the light and examine a red fluid that was in the barrel. Edward said that the sick man's eyes had not their usual appearance and "were very dreary looking"; that he tried to talk with him and could elicit nothing but a mumble. On the two following days Edward again visited the hospital, found his brother convalescing, and about a week later saw him doing guard duty. On all three occasions but the first, Henry complained of severe pains in his head and eyes and his stomach.

Two months after the visit to the hospital Edward was again summoned to Camp Merritt because Henry was confined to the army hospital with pneumonia. The latter still complained of pain in his head and

eyes and stomach, and the government medical chart on December 24, 1918, bore the entry "not entirely rational." After his discharge from the army, on February 14, 1919, he came to New York and lived with Edward. While there, Edward said that his brother frequently had delusions about fires, though there were no fires, imagined that lights were flashing in his face, and that people were pursuing him, that he would at times hide under the bed and that he continued to complain of pains in his head, eyes, and stomach. All this was confirmed by Edward's wife. In April, 1919, Henry moved and went to live with his mother on First avenue, but, according to the testimony of both Mr. and Mrs. Cudmore, who testified that they saw him there frequently, his condition did not change for the better and the pains and delusions continued up to January 24, 1921, when he was committed as insane.

The incompetent was apparently in good mental and physical health prior to enlistment in the army and there seems to have been no taint of insanity in his family. He also seems to have been generally in good health up to the time in October, 1918, when his brother and mother first visited him in the hospital at Camp Merritt. When he was examined on February 11, 1919, just prior to his discharge, he stated in his written signed declaration that he had no reason to believe that he was then "suffering from the effect of any wound, injury or disease" or that he had "any disability or impairment of health." The certificate of the examining surgeon likewise was to the effect that he was then "physically and mentally sound."

In July, 1919, Henry Cudmore applied for government employment, as an "unskilled laborer," under the act of Congress granting a preference to honorably discharged soldiers. He secured an appointment, entered the service of the United States as a chauffeur mechanic at a salary of $1,200 per year, and held that position until October 15, 1919. On October 30, 1919, he again secured employment as a laborer at $3.60 per day and worked at Governors Island until December 16, when he resigned in order to seek a better position. On January 19, 1920, he was re-employed as a laborer, first class, and remained so employed for that entire year. The army records show that during the whole of 1920 he was only absent nineteen days, fifteen of which were without leave, two with leave, and two because of sickness. During the first two months of 1921 (when apparently he was mentally incompetent) he was allowed sixty days with pay covering both thirty days' sick leave and thirty days' annual leave.

In spite of the government records during 1920 which indicate that he was working pretty steadily, Edward Cudmore and his wife both testified that Henry was sick and absent two or three days a week while he was employed at Governors Island, and that at such times he was subject to the pains and delusions we have mentioned. Mrs. Edward Cudmore testified that when he had his severe headaches she and his mother used to put ice bags on his head in the hope of relieving his pain. When he was thus absent from work, Edward said that he would report Henry's condition to Captain Sullivan, who was in charge of him at Governors Island. Finally, Henry became sick so often that Captain Sullivan sent for Edward and suggested that he be taken to Bellevue Hospital for examination, where, as a result of the examination in January, 1921, he was found to be suffering from dementia præcox and was committed to an insane hospital.

The theory of the plaintiff is that the indulgence of Captain Sullivan to a veteran enabled Henry to have his frequent absences ignored and to draw pay when he was really unable to do continuous work, and that the government record is thus explained.

The psychiatrist whom the plaintiff called as a witness testified that persons suffering from dementia præcox often can do simple work for a time, though they are subject to relapses and cannot be relied on. It was his opinion that, except for kindly supervision and indulgence, Henry could not have pursued any gainful occupation, and in the ordinary run of competition was, prior to March 31, 1919, when his policy lapsed, unable to continue to work at any occupation. The psychiatrist further testified that a patient suffering from dementia præcox would not usually complain of headache unless there was some additional factor, such as a head injury. He added that an infection or injury followed by dementia præcox after a few weeks was likely to have been the cause of the latter malady.

It is argued that all this is too speculative to serve as the foundation of a verdict. It is to be remembered that there was evidence that the incompetent had severe headaches and delusions in February, 1919, which continued indefinitely thereafter, that in January, 1921, at Bellevue Hospital there was a definite diagnosis of dementia præcox for which he was committed to an insane

asylum, and that the physician was of the opinion that these continuous symptoms showed that the patient was afflicted with dementia præcox before the lapse of his policy. The government called no expert and in no way sought to explain the origin and development of the disease, but was content to rely on its own records as proof that it did not begin until a few months before January, 1921. The withdrawal of fluid from the lumbar region in October, 1918, was a recognized way of detecting an infection from a head injury which is known to be one of the causes of dementia præcox. We think that enough was shown to enable a jury to find that dementia præcox existed in February and March, 1919, and that the psychiatrist in attributing the cause to a possible head injury was merely offering an explanation for a condition found to exist before the lapse of the policy, whatever might have been the cause.

It is true that the plaintiff did not call Captain Sullivan, but evidence was offered that he could not be found. The testimony of the mother of the incompetent was unavailable because she was not living at the time of the trial. Moreover, the insured has been for years incompetent, which is at least some explanation for not bringing an action sooner.

We have examined the exceptions relied on by the government, and are of the opinion that they are insufficient to justify interference with a verdict that in general has adequate foundation in the evidence.

While many actions to recover upon war risk insurance policies are puzzling because of contradiction between the government's records and the testimony on behalf of the insured, and while the present case is a close one, we think that there was enough evidence of the inception of dementia præcox prior to the lapse of the policy to render the case distinguishable from our decision in United States v. Lumbra, 63 F.(2d) 796. In affirming that decision, the Supreme Court remarked that the insured for "more than five years out of the ten following the lapse of the policy worked for substantial pay," and that "no witness, lay or expert, testified to matters of fact or expressed opinion tending to support petitioner's claim that he had suffered 'total permanent disability' before his policy lapsed." Lumbra v. United States, 290 U. S. 551, 561, 54 S. Ct. 272, 276, 78 L. Ed. 492. Here the time of working was much shorter than in Lumbra's Case, and the evidence as to severe headaches beginning

in October, 1918, and frequent headaches, delusions, and incapacity from February, 1919, culminating, in January, 1921, in adjudication of incompetency, seems to us to have made his case one for submission to the jury.

Judgment affirmed.