**UNITED STATES v. BODGE.**

No. 1380.

Circuit Court of Appeals, Tenth Circuit.

Aug. 13, 1936.

Randolph C. Shaw, of Washington, D. C. (Will G. Beardslee, Director, Bureau of War Risk Litigation, of Washington, D. C., Wilbur C. Pickett, Sp. Asst. to the Atty. Gen., J. Gregory Bruce, Atty., Department of Justice, of Washington, D. C., and Summerfield S. Alexander, U. S. Atty., and R. T. McCluggage, Asst. U. S. Atty., both of Topeka, Kan., on the brief), for the United States.

Lawrence E. Goldman, of Kansas City, Mo. (Frank R. Daley and Goldman & Daley, all of Kansas City, Mo., on the brief), for appellee.

Before PHILLIPS, McDERMOTT, and BRATTON, Circuit Judges.

BRATTON, Circuit Judge.

This is an action on a war risk insurance contract. Plaintiff enlisted in June, 1918, served overseas, and was discharged in June, 1919. Premiums paid and the grace period continued the policy in force until October 31, 1919. The only question presented is whether the finding of the jury that insured became totally and permanently disabled on or before that date is supported by substantial evidence.

In the determination of that question all conflicts must be resolved in favor of insured and the evidence viewed in the light most favorable to him. United States v. Linde (C.C.A.) 71 F.(2d) 925. Thus considered, there was evidence which tended to establish these facts. Before induction into the service, insured was robust, industrious, above normal in mental alertness, and had a high school education. During the year immediately preceding enlistment he farmed 200 or 300 acres of land and raised wheat, corn, hay, and row crops. From the time he returned home until about July 1st he lay on a cot most of the time and was up very little, only when persons came to visit him. About July 1st he went to visit relatives at a nearby town and was stricken with serious illness. He remained in bed there about seven weeks and then returned home. During the next four years he felt sick most of the time and was up and down. During that time and ever since he had a bad cough and sometimes raised blood; his nose bled at intervals; he suffered pains in the region of the heart and had shortness of breath; he had short, sharp pains in his feet and one leg gave trouble when he walked; his lips were blue and at times he had pains in different parts of his body. His mental condition was below normal. He was dull and apathetic and had poor judgment. Sometimes when asked a question his answer was entirely foreign and he did strange things, such as failing to return when sent on a hurried mission or leaving his companion on a trip without explanation. The physician who

was summoned when he fell sick found him prostrated and in a more or less nauseated condition with a temperature of 105 and a pulse of 130. The diagnosis made at that time was typhoid fever and he was treated accordingly. An extension of the abdomen began a few days later, and on two occasions a trocar was passed through the abdominal wall and two and a half gallons of fluid removed from the abdomen each time. That physician continued to treat insured for about eleven months. The early diagnosis of typhoid fever was later withdrawn and the subsequent diagnosis was severe mitral insufficiency with regurgitation, dyspnea, interference in the circulatory system with blood spilling into the tissues of the feet and causing a deposit of serum there; and œdema of the brain, which caused dulling of perception or conclusion. It was the opinion of the physician that the condition of the heart and mind was permanent and that in consequence insured could not farm or fill any position which required mental labor. Another physician treated him a few days in August, 1919, and found that he had a mild fever, a rapid pulse, and a cyanotic heart. The diagnosis was endocarditis caused by typhoid fever. That physician further treated him for about three months in 1922 and found substantially the same condition with respect to heart action and pulse; and he noted mental dullness and apathy on both occasions. It was his opinion that the condition was permanent. A third physician examined and treated insured repeatedly from 1922 until the time of trial. He found chronic tachycardia, valvular difficulty, and stenosis on both sides of the heart. It was his opinion that a person having a valvular condition of that kind could not farm or do ordinary physical labor without endangering his life. Predicated upon frequent examinations, and association with insured on several occasions, it was the further opinion of the physician that he was a dementia præcox, incompetent and harmless. A medical officer of the Veterans' Bureau examined him in June, 1920, and made a diagnosis of endocarditis, chronic, mitral regurgitation with poor compensation, slight exertion caused marked tachycardia and irregular heart beat; general condition poor. He reported that insured was bedridden; unable to resume former occupation; degree of vocational handicap resulting from disability major; training infeasible; reasonable presumption that disability was due to military service and that prognosis was poor. Several subsequent examinations resulted in diagnoses and prognoses which were similar in certain respects.

Three physicians from the Veterans' Administration who had conducted some of the examinations testified concerning the condition which they found, and they expressed the view that insured could do light work, such as driving an automobile or truck or could fill a clerical position. But the jury was not required to indolently accept their testimony. United States v. Gower (C.C.A.) 50 F.(2d) 370. It merely formed an issue of fact for the jury to resolve. Barksdale v. United States (C.C.A.) 46 F.(2d) 762.

The industrial record of insured is relied upon to defeat recovery. For more than five years after discharge he did no work except light chores, such as feeding the chickens and aiding with the dishes. In the fall of 1924 he and his brother and his sister opened a garage in a building owned by their mother in a small town having a population of about 350. They operated it for about ten months, but his brother did the mechanical work and his sister sold gas and oil. He sold a few accessories and did part of the banking business, but no other work; and he was confined to his bed three times of two or three weeks each. Next, he and his brother were jointly interested in farming for two years, but the work was done by a hired man. Insured did not do any work except to take gas, oil, and water to the field for use in the tractor and dinner to the workmen, and that seemingly was done only during harvest. When at the farm he usually sat in an automobile, but sometimes he would stoop over or lie down. Then he joined in conducting a skating rink in a building which had been taken under a mortgage which he and his mother owned, and the building was rented for basketball games on certain nights. Some time later a feed and seed business was started in a room about eighteen by twenty feet which was a part of the building. His sister rented skates; a paid employee did the work on the floor of the skating rink; and some boys helped clean the floor in return for the privilege of skating and attending basketball games. All that insured did was to collect the money, deposit it in the bank in his name, and draw checks against the account. The employee referred to and members of insured's family did virtually all the work

in connection with the feed and seed business. He made purchases, but much of them was unmarketable. He did some hauling with a small truck, but it apparently was inconsequential in volume. The town had a population of only 500; the building was only a block from the bank; the president of the bank did not know that he was engaged in the trucking business and had never seen him doing any work of which to speak.

Stress is laid upon the fact that in 1928 and in 1930 insured made application for two nonmedical insurance policies and received them; that he stated in the application his occupation had been that of farming and trucking; that he had not been absent from his duties within the preceding two years on account of illness; and that he did not then have, and never previously had, any of many enumerated diseases or any serious disease or disorder. He testified that a soliciting agent filled in the answers; that he did not read them; that he told the agent he was receiving disability compensation; and that the agent was familiar with his condition. The agent corroborated that testimony in part. Any conflicts or inconsistencies between the answers thus made and the contention of total and permanent disability advanced at the trial were matters for the jury to determine. They are not decisive on appeal. United States v. Jorgensen (C.C.A.) 66 F. (2d) 292.

Of course, the burden rested on insured to show by substantial evidence that he became totally and permanently disabled while the policy was in force, but a bedfast condition is not requisite to recovery on an insurance contract of this kind. Nicolay v. United States (C.C.A.) 51 F.(2d) 170; United States v. Rye (C.C.A.) 70 F.(2d) 150; United States v. Thomson (C.C.A.) 71 F.(2d) 860. The test is whether he could follow continuously any substantially gainful occupation. Even though unable to pursue his pre-enlistment occupation, recovery cannot be awarded if he could perform continuously some lighter or less strenuous work which was substantially gainful. United States v. Luckinbill (C.C.A.) 65 F. (2d) 1000; United States v. Derrick (C.C.A.) 70 F.(2d) 162; Hughes v. United States (C.C.A.) 83 F.(2d) 76.

It would not serve any useful purpose to engage in a further discussion of the evidence. Without doing so and giving due weight to the long delay in the institution of the action as a circumstance which indicates, as the court instructed the jury, that insured did not then consider that he was totally and permanently disabled before the policy lapsed (Lumbra v. United States, 290 U.S. 551, 54 S.Ct. 272, 78 L.Ed. 492; United States v. Spaulding, 293 U.S. 498, 55 S.Ct. 273, 79 L.Ed. 617; Miller v. United States, 294 U.S. 435, 55 S.Ct. 440, 79 L. Ed. 977), also according due weight to the answers contained in the applications for insurance and the other facts in the record, we cannot say that the finding of the jury is without substantial support. So the judgment is affirmed.