## UNITED STATES v. WITBECK.
### No. 7543.

United States Court of Appeals for the District of Columbia.

Argued April 10, 1940.

Decided May 29, 1940.

Allen Crenshaw, of U. S. Atty.'s office, and Fendall Marbury, of Department of Justice, both of Washington, D. C., for appellant.

Warren E. Miller, of Washington, D. C., for appellee.

Before GRONER, Chief Justice, and EDGERTON and VINSON, Associate Justices.

EDGERTON, Associate Justice.

The war risk insurance policies of Albert T. Witbeck lapsed on January 13, 1933. He died December 1, 1933. His mother has recovered judgment on the policies, and the government appeals. The jury were instructed that they might find for the plaintiff on the theory that, by January 13, 1933, "the insured became permanently and totally disabled by reason of impairment of mind to the extent and degree that by reason thereof he was unable to follow continuously some substantial, gainful occupation." This appeal is based on the court's refusal to direct a verdict for the defendant, and on alleged errors in admitting and excluding evidence.

Witbeck was at one time a capable engineer and writer. In 1922 his employer discharged him for "contrariness" and failure to carry out orders. After that

he undertook general engineering practice. By 1932 he had practically no work, though in June, 1932, he gave useful expert testimony in one law suit. Although he often talked about going to work, he did no work whatever in 1933. His only suit was worn out, and he lived with his young son in one room over a garage.

The testimony favorable to appellee includes these items. As early as 1931 Witbeck, who had always been neat, ceased to care whether he was clean or had clean linen. He sometimes wrote fifteen letters in a night and tore them up. He "would foam all over." He called people on the telephone, and talked nonsense or hung up without waiting for an answer. When a lady whom he scarcely knew called on his mother, he stayed in the room in his underwear. He threw hot coffee on his mother's dog and then petted him. From 1931 to his death he was very nervous, and "would go up in the air" at suggestions that did not please him. He made unfounded charges against his wife and mother. He thought people "had it in for him that didn't have it in for him at all." In 1932 and 1933, he slept every night with a four-foot knife beside his bed. He frequently got up and walked about the house, carrying the knife and making threats. He sometimes tore up his young son's collection of pictures, and at other times helped him with it. His mind "would go blank." He sometimes thought he or his son was being followed. He frequently got up and followed the boy on his early morning paper route. In 1932 he left threatening letters on the porch of a woman acquaintance. In the spring of 1933 he asked her to mail a package for him, and when she refused he went to the postmaster and "raved and made all sorts of accusations." In 1933 "he was always threatening people with a curse and things like that * * * He looked dirty * * * and he smelled dirty." In 1932, when a witness refused to admit him to her house, he looked "fiendish" and she was "grateful for the protection of the screen door." He told a woman that he had trained his boy to make insulting remarks to her. In May, 1933, he wrote a letter which contained this attempt at a sentence; "Constantly eating into my little store of savings, together with a seeming mental trouble, and having given up my position as Chief Engineer, for Potter Palmer Oil and Gas interests, now the United Gas Corporation." In August, 1933, when he was charged with contributing to the delinquency of his young son, he rushed to the judge and asked him; "What is the reason I cannot get a trial in this court?" The judge thought he "acted like a crazy man," and discussed him with the sheriff because he considered him "an abnormal person." "During 1931 * * * he seemed to have a lot of friends. Just before he died he didn't seem to have any friends at all." Various witnesses who observed him in 1931, 1932 or 1933 testified that he "wasn't right," "raved" and "looked queer," was not mentally balanced or rational, was crazy in some ways, and acted like an insane man. One witness testified that "there were many occasions when he most certainly was insane."

■ In 1928, Dr. Butler was coroner of the Louisiana parish where Witbeck lived, and officially examined his mental condition. Witbeck complained to him, without foundation, of a needle broken off in his back, and told him of peeping over transoms, cutting peep holes through walls and ceilings, and reading friends' correspondence without permission. Dr. Butler concluded that he was "incompetent and unreliable," "unable to rationally follow out any definite or reasonable project," and "progressively worse"; that his mental condition "interfered with his doing any work of any dependability or doing dependably anything that he started out to do"; that as to manual work, "physically I think he could have done it but from the standpoint of desire I hardly think he would have done it." The government complains of the admission of those parts of Dr. Butler's testimony which contained or were based upon statements made to him by third persons. The incidents reported to him, which consisted chiefly of threats to commit suicide or to injure others, added little to his own observations. Moreover, his entire testimony was relatively unimportant, for it related to conditions in 1928. The case turned on Witbeck's condition in 1933, as to which there was more direct evidence. There was no prejudicial error in admitting Dr. Butler's testimony.

■ There was testimony to the effect that Witbeck was not only sane, but capable of doing some work, until his death. But the weight of the evidence was for the jury, and there is substantial support for its verdict. When commitment is

not at issue, laymen may testify to sanity or insanity, since "the appearance and conduct of insane persons, as contrasted with the appearance and conduct of persons of sound mind, are more or less understood and recognized by every one of ordinary intelligence * * *"[1] Even if he was sane, Witbeck may well have been totally and permanently disabled by the impairment of his mind. We have held that ability to work spasmodically from time to time,[2] or even to work for considerable periods,[3] does not conclusively disprove total and permanent disability within the meaning of a war risk policy.

 The government contends that the court erred in excluding parts of the deposition of Dr. Kerlin, an acquaintance of Witbeck who examined him in October, 1933. The report of the examination itself was admitted, because Witbeck himself had sent it to the Veterans' Bureau. The court correctly ruled that so far as Kerlin's opinions were based on information received in professional confidence, they should be excluded.[4] The record shows that government counsel thereupon "marked different questions and answers, some of which were admitted and some of which were left out" when the deposition was read to the jury. Although the record contains the whole deposition, it indicates only a few of the parts which were admitted and does not indicate what parts were excluded. Accordingly it discloses no error, and we must assume there was none.[5]

Affirmed.

[1] Connecticut Mut. Life Ins. Co. v. Lathrop, 111 U.S. 612, 619, 4 S.Ct. 533, 28 L.Ed. 536.

[2] Burgoyne v. United States, 61 App. D.C. 97, 57 F.2d 764.

[3] United States v. Stewart, 61 App. D.C. 115, 116, 58 F.2d 520.

[4] D.C.Code, Tit. 9, § 20.

[5] Cf. Ricketts v. United States, 59 App. D.C. 47, 32 F.2d 943.