**UNITED STATES v. McCAIN.**

No. 2184.

Circuit Court of Appeals, Tenth Circuit.

March 18, 1941.

Thomas E. Walsh, of Washington, D. C. (Summerfield S. Alexander, U. S. Atty., of Topeka, Kan., Julius C. Martin, Direc-

tor, Bureau of War Risk Litigation, and Wilbur C. Pickett, Sp. Asst. to the Atty. Gen., both of Washington, D. C., Charles L. Chalender, Atty., Department of Justice, of Kansas City, Mo., and Keith L. Seegmiller, Atty., Department of Justice, of Washington, D. C., on the brief), for appellant.

Peter F. Caldwell, of Topeka, Kan. (J. D. M. Hamilton and Barton E. Griffith, both of Topeka, Kan., on the brief), for appellee.

Before PHILLIPS, MURRAH, and WILLIAMS, Circuit Judges.

MURRAH, Circuit Judge.

The plaintiff, now appellee, brought this suit under the total and permanent disability provisions of a war risk insurance policy issued to him while in the military service of the United States. The policy lapsed for non-payment of premium on May 31, 1919.

The question presented is: was he totally and permanently disabled within the meaning and the terms of the policy on or before that date. The trial court so found and adjudged. The government, the appellant here, has appealed. "The only question before us is whether there is any substantial evidence to support such finding." United States v. Fitzpatrick, 10 Cir., 62 F.2d 562, 563; Storey v. United States, 10 Cir., 60 F.2d 484; United States v. Peet, 10 Cir., 59 F.2d 728, 729; United States v. Tryakowski, 7 Cir., 50 F.2d 766; United States v. Phillips, 8 Cir., 44 F.2d 689.

The evidence discloses that the plaintiff, when twenty-one years of age, was inducted into the service of the United States Army, on February 23, 1917. He sailed for France on June 14, 1917, and while in active combat on or about May 25, 1918, he sustained a shrapnel wound of the left arm. He remained in various hospitals in France until July 17, 1918, when he was released and recommended by the disability board for "Special Training." He remained in the Special Training Battalion until August 9, 1918. He had the flu for the second time in November, 1918, was sent to a Classification Camp in December, and returned to the United States on February 19, 1919, with a Casual Company. On July 30, 1919, he was transferred to a Supply Company, where he remained until March 17, 1920, at which time he was furloughed to the Regular Army Reserve,

and was thereafter discharged on June 4, 1920.

It is fair to conclude that after he was wounded on May 25, 1918, he performed very little active service. The hospital record shows that while he was confined to the hospital as a result of the wound of his left arm, he also complained of severe headaches, became sick at his stomach, and got dizzy spells. From the time he entered the Base Hospital in France with the gunshot wound in his left arm, he has a continuous hospital and medical history of nervous and mental disorder.

After plaintiff's furlough from active service (March 17, 1920), and before he was discharged from the Reserve (June 4, 1920), he secured employment with an automobile parts manufacturing company in St. Louis, Missouri, at $75 per month, where he worked until May 18, 1920.

On May 22, 1920, he was in the government hospital at St. Louis, Missouri, having been referred there by the United States Public Health Service, where he showed a "tendency to make assaults on employees and patients, periods of depression and sullenness." He wanted to be released from this hospital so he could return to Mexico to marry a Mexican girl; made absurd remarks and requests; had peculiar ideas. He was diagnosed as a dementia praecox, and was committed to what is known as the "closed ward." On July 10, 1920, the hospital records show that he was "restless," "sullen," and "combative." On August 8, 1920, he was transferred to the "open ward," at which time he was found to be very "polite" and "loquacious" with a feeling of "elation," which was observed to be the very opposite of his attitude when he entered the hospital facility. On August 20, he was "overly pleasant, working very hard, helping in all kinds of work about the hospital." He worked so hard one day that he had an attack of vertigo. The hospital records further show that he was transferred to Knoxville, Iowa, but escaped from the hospital before the ambulance left the grounds. His actions were suggestive of a manic depressive psychosis, and on that date, August 20, 1920, he was discharged "unimproved."

On December 31, 1920, he was again examined at St. Louis, Missouri, by the government hospital facility, and diagnosed as a "Paranoid." In June of 1921, he was again examined by the government facility at St. Louis, Missouri, and diagnosed as a dementia praecox. During this interim he was awarded $80 per month compensation and a guardian had been appointed for him. During this time he had been examined for insanity by a committee of doctors in Topeka, Kansas, to determine whether or not he should be committed to the state hospital for the insane, but was referred to the government facility for further treatment. He had also been in the Barnes Hospital at Osage City, Kansas, for about two weeks.

He continued under observation by government facilities until January 28, 1922, when he accepted an offer for vocational training at Bellevue, Nebraska, after having been again diagnosed as a dementia praecox, in the same month of 1922. At the vocational training school he was found to be erratic, talked in a circle, had an exaggerated ego, and paranoid personality. The records of this school show that in June, 1923, he could not be trusted to do much work, only under very close supervision, and "it is very doubtful if anyone would give him employment," and in that month (June, 1923), he was discharged to take up placement training as a livestock laborer at the Omaha Stockyards, Omaha, Nebraska. At that time the medical officer stated: "In my opinion this man will not last thirty days on the job."

He failed to adjust himself, was injured, and was back for further examination in August of 1923. At that time hospitalization was recommended and it was thought that his condition was liable to progress and he was in a mild hypo-manic state. Custodial care was recommended. He was admitted to the United States Veterans Hospital at Jefferson Bks., Missouri, on September 11, 1923, where he was under observation and treatment, part of which time he was in a psychopathic ward, and was discharged on November 6, 1923, at his insistence.

He continued to return to government doctors for examination and diagnosis, during all of which time he complained of his inability to adjust himself, to hold steady employment, and the examiners continued to note various forms of mental instability. He was diagnosed as dementia praecox, paranoid, hypo-manic, incompetent, constitutional psycho-neurosis of a mixed type. In 1936, he was admitted to the Veterans Administration Facility at Wadsworth, Kansas, at which time he stated to the physicians that he wanted an

easy way to die, and went to a physician to inquire about some painless method of suicide.

The record is replete with evidence showing that he was incapacitated to adjust himself to the problems of society, and to engage in any substantially gainful occupation from the date of his hospitalization in France from the gun-shot wound, until the trial of this case. Although the examiners at the various hospital facilities for the government do not agree upon the exact diagnosis, it is only a question of degree. It is plain that although his condition is functional, it has been incapacitating.

His work record conforms to his medical record. He worked in an automobile factory for approximately two months. He left there and was committed to a government hospital. He did not respond to vocational training. His work at the stockyards at which he had been placed as a ward of the government for trial rehabilitation was unsuccessful. During this time he was tried for insanity at Topeka, Kansas, and was returned to the hospital at St. Louis, for treatment and observation. He attempted to do farm work, but earned and received little more than board and room.

From 1927 until the trial of the case he did odd jobs around a small hotel in Osage City, Kansas. The evidence shows that the owner of this hotel had known him all of his life; that he was permitted to come and go at his pleasure, and that he chose to come and go at various intervals. He worked some at a hospital, tending the furnace, for which he received $4 a week.

The evidence shows that he had fifteen or twenty jobs from the time he was discharged from the Army until the trial of the case. None of them can be said to be substantially gainful. "Ability to work spasmodically from time to time or to work for considerable periods does not conclusively prove that insured is not 'totally and permanently disabled' within meaning of war risk policy." United States v. Witbeck, 72 App.D.C. 231, 113 F.2d 185. See, also, United States v. Linde, 10 Cir., 71 F.2d 925. The test is whether the plaintiff, at the time his policy lapsed, May 31, 1919, for non-payment of premiums, had a disability which rendered it impossible for him to follow continuously in a substantially gainful occupation, founded upon conditions which indicate with reasonable certainty that such impairment would continue throughout his life. United States v. Linde, supra; United States v. Fitzpatrick, supra; United States v. Peet, supra; and Hirt v. United States, 10 Cir., 56 F.2d 80.

The case was tried to the court, a jury having been waived. The trial court observed the plaintiff, and all witnesses who testified in the case. True, there was some divergence of opinion concerning his exact mental status, but it cannot be denied that his mental disorder is definite and pronounced, and that it was recognized by the government before his discharge from the Army.

The policy of insurance sued upon here lapsed for non-payment of premium on May 31, 1919. He remained in the active service of the government until March 17, 1920, in what is known as a Casual branch of the service. He was required to do no work, and no doubt did none. He was furloughed to the Army Reserve. The reason for this is not made plain, but the record shows that before he was discharged from the Army Reserve on June 4, 1920, he was diagnosed by the government facilities as a dementia praecox, that he was honorably discharged from the Reserves while under observation by the United States Public Health Service, and that on August 20, 1920, he was discharged from the hospital facility "unimproved."

If the findings of the trial court have substantial support in the record, we are not warranted in overturning them unless they are found to be clearly erroneous, and in the determination of this question, we must give due regard to the opportunity of the trial court to judge the credibility of the witnesses. Federal Rules of Civil Procedure, rule 52(a), 28 U.S.C.A. following section 723c, Gray v. United States, 8 Cir., 109 F.2d 728.

The findings of the trial court are not "clearly erroneous," and the judgment is affirmed.