## HILBERT v. UNITED STATES.
### Civ. No. 133-D.

District Court, E. D. Illinois.
March 25, 1942.

Eugene Bland, of Shelbyville, Ill., for plaintiff.

William M. Lytle, Atty. in charge, Bureau of War Risk Insurance Litigation, of Chicago, Ill., for defendant.

LINDLEY, District Judge.

Plaintiff sues to recover war risk insurance for his ward, a mentally incompetent World War veteran who enlisted on August 28, 1918 and was discharged on November 15, the same year, by reason of "constitutional psychopathic state." He had been honorably discharged from an earlier service on January 22, 1918. During his last service, he carried certificate for $10,000 of war risk insurance upon which the premiums were paid to November 20, 1918, extending the insurance for thirty days. On June 27, 1939, the conservator filed a claim for his ward. This was denied December 23, 1940, notice being mailed the same day; the suit was filed January 19, 1941.

Plaintiff claims that his ward was at the time of his discharge and at all times thereafter totally and permanently disabled or that if his disability did not become permanent until after his discharge, compensation due him was such as to cover any unpaid premiums and thus extend the insurance until the time when he did become totally and permanently disabled.

It appears clearly from the evidence that the insured has always been mentally deficient. His father and uncle died in insane asylums. He was first examined, so far as is shown by the evidence, after his return, in 1919. A local representative of the United States Public Health Service examined him December 30, 1919, finding him generally debilitated, very nervous and suffering from delusions, making a diagnosis of "mental." This physician reported that claimant was unable to resume his former occupation and advised that he be sent to a hospital at the earliest possible time. The following January, the same physician again examined claimant making substantially the same findings and a diagnosis of "probable paranoia." The doctor again found that the insured was unable to resume his former occupation and reported that he had been sent to a hospital for mental diseases and had remained about three weeks and then returned home without notifying anyone at the hospital. On April 12 the same physician again examined the insured, with substantially the same findings and the same diagnosis, saying that there was a reasonable presumption that claimant had a disability due or traceable to his military service, to a degree of "100 per cent vocational handicap" and that his physical and mental condition did not render training feasible.

On July 17, 1919 the United States Public Health Service Branch at St. Louis gave him a complete examination. The physician made a diagnosis of "intestinal neurosis, constitutional psychopath." And in January, 1920, at the United States Public Health Hospital at Waukesha, a group of physicians examined and reported fully upon the claimant. They agreed that the man should be confined in a hospital for the insane and kept under close surveillance on account of probable suicidal tendencies. Their conclusion was that the patient was unable to resume his former occupation. Various members of the staff participated and record was kept of their discussion. They found that claimant harbored persecutory delusions. Dr. Heldt stated that the question in his mind was whether the patient should be "grouped out and out as a dementia praecox or as a constitutional psychopathic state, paranoid personality." He was inclined to think claimant's condition was more nearly a "constitutional psychopathic state than a true schizophrenia." Dr. Benton stated that "it looks like a praecox" and that "a psychosis accompanying a psychopathic state would also fit it very well," and added, "he has a paranoid trend because he has no capacity to have any other. The only thing he has left is his instinct of self-

protection. He believes every man is his enemy or possible enemy." Dr. Kolb suggested that "constitutional psychopathic state" might be added. Dr. Heldt said "the question may be raised as to whether we regard 'state' as a temporary or a permanent condition. In the neuro-psychiatric nomenclature that was followed in the army we listed no constitutional inferiority, grouping those cases under the mental deficiencies, and under constitutional psychopathic state we grouped those congenitally ill-balanced and eccentric individuals, whom we defined as inadequate personalties, as emotional instabilities, sexual psychopaths," etc. Hence, we looked upon "state" as a "permanent condition". Dr. Frisch commented "just saying constitutional psychopathic state is putting it mildly. I think this man is a real praecox—got these ideas in his head—probably never get them out. He has a real praecox reaction. The man really is a real praecox on a constitutional basis—constitutional psychopath—paranoid possibilities—all that, but this man is fixed." Dr Benton added "The man will fit very well in either classification—d.p., paranoid type, or constitutional psychopathic state with dementia praecox—either one is correct." The group made a final diagnosis of dementia praecox, adding "the patient's status so closely resembles a constitutional psychopathic state, paranoid personality, that a complete differentiation is not possible." The veteran departed from this hospital without permission.

The reports of various physicians and other evidence indicate clearly that the insured became mentally deficient while he was in the service. During that period he was sent to the neurosthenic hospital, remaining there for six weeks just prior to his discharge. He returned to his home. He had, previous to service, been a common laborer, and endeavored to go back to the same work but gave it up at the end of three weeks. He then endeavored to earn some money by selling pencils and small articles. His sister testified that after each attempt he would come home and go to bed. Various lay witnesses testified as to certain peculiarities and delusions. He thought people were putting things in his well. He thought the government was pursuing him for desertion. He has done no substantial work since 1919 and his sister and brother-in-law both said that dur-

ing all of this time it was impossible for him to carry on any continuous labor. The master mechanic of a local industry, who had been a lieutenant colonel in the World War, testified that while he had observed him, he had not been capable of carrying on the work he had previously done for him as a laborer.

Various other physicians examined him for the Veterans' Bureau. Dr. Dawson an expert alienist, in answer to a hypothetical question, indicated that a man such as was within the facts such as were presented here had been totally and permanently disabled ever since his discharge and had been unable to work continuously at any gainful occupation.

From all of the evidence it seems to me that the only possible conclusion is that the insured has been totally and permanently disabled ever since his discharge, within the sense of that term as defined by the statute. It is apparent that he is incapable of directing himself at any labor and lacks capacity to work continuously for any length of time under any supervision. How much of his disability is due to his constitutional endowment and how much to the disability suffered while in service it is impossible to determine, but in view of the fact that he was able to earn a living prior to his service in the army and has since been unable to, it seems only reasonable that he recover.

Claimant was found incompetent by the County Court and a conservator appointed for him who served until the year 1935. At that time claimant petitioned that the conservator be removed and that he be restored to his former estate. Thereafter he had charge of his own affairs until May 1, 1939 when he was again adjudged incompetent and the present conservator appointed. The government insists, therefore, that the statute of limitations has run against his claim for the reason that more than three years elapsed after he was restored in the County Court before he filed his claim for insurance. The pertinent act of Congress, 38 U.S.C.A. §§ 445–445d, provides that no suit for insurance shall be allowed unless it shall be brought within six years after the right accrued provided, however, that insane persons, or persons under other legal disability, or persons rated as incompetent or insane shall have three years in which to bring suit after the removal of their disabilities.

The record discloses that in 1936 and 1937 the veteran was rated by the Veterans' Bureau and found to have dementia praecox and to be incompetent and insane "from July 21, 1920." The government admits that total and permanent disability has existed since 1939.

Illinois Rev.Stat.1937, ch. 85, par. 1, provides that the word "insane" shall be construed to mean "any person who, by reason of unsoundness of mind, is incapable of managing and caring for his own estate, or is dangerous to himself or others, if permitted to go at large, or is in such condition of mind or body as to be a fit subject for care and treatment in a hospital or asylum for the insane: Provided, that no person, idiot from birth, or whose mental development was arrested by disease or physical injury occurring prior to the age of puberty, and no person who is afflicted with simple epilepsy shall be regarded as insane, unless the manifestations of abnormal excitability, violence or homicidal or suicidal impulses are such as to render his confinement in a hospital or asylum for the insane a proper precaution to prevent him from injuring himself or others."

 The government argues that the verdict of the jury and the judgment of the court, restoring the insured to the management of his own estate in 1935, constituted an adjudication that he was not insane and that, therefore, the three year provision of the statute running from that date bars a claim filed after the expiration of such period. Unfortunately, however, the verdict of the jury in the state court is not an adjudication of the question presented for this court, namely, was the plaintiff an incompetent person within the meaning of the federal statute?

The Illinois statutory definition fixes a rule under which a person within its terms is insane but the statute does not exclude other parties who are in fact insane from the classification. In other words, the statute is inclusive of certain specified cases but does not provide by statutory edict that a person not within the classes named shall not be considered insane. The question is whether the man is insane within the federal statute. Consequently, 28 U.S.C.A. § 725 as interpreted by Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, does not govern.

Under the repeated decisions of the various circuits and of the Supreme Court, I am of the opinion that, irrespective of the appointment of a conservator or his discharge, the insured's mental condition was at all times subsequent to 1919 such as to make him wholly irresponsible and to prevent his having any capacity for determination of whether he had any legal rights or should consult a lawyer and that he was at all times during said period wholly mentally incapable as well as totally and permanently disabled. Pertinent cases are Halliday v. United States, 62 S.Ct. 438, 86 L.Ed. ——, decided January 19, 1942; United States v. Pritchard, 10 Cir., 95 F.2d 619; Knapp v. United States, 7 Cir., 110 F.2d 420; Tieben v. United States, 7 Cir., 96 F.2d 907; United States v. Warren, 8 Cir., 97 F.2d 722; United States v. Smith, 9 Cir., 117 F.2d 911; United States v. McCain, 10 Cir., 118 F.2d 479; United States v. Witbeck, 72 App. D.C. 231, 113 F.2d 185; Plocher v. United States, 6 Cir., 87 F.2d 860; United States v. Bodge, 10 Cir., 85 F.2d 433; Gray v. United States, 8 Cir., 76 F.2d 233; Rackoff v. United States, 2 Cir., 74 F.2d 720.

The findings and conclusions herein will be included in my more formal findings and conclusions by way of reference.

Judgment will enter in accord with my conclusions of law.