### DYKE v. DYKE et al.
### Civ. A. No. 2186.

United States District Court
E. D. Tennessee, N. D.

June 21 and July 12, 1954.

Acuff & Acuff, H. F. Atkins, Knoxville, Tenn., for plaintiff.

J. H. Doughty, Hodges & Doughty, John C. Crawford, Jr., U. S. District Attorney, Asa R. Ambrister, Atty., Knoxville, Tenn., for defendants.

ROBERT L. TAYLOR, District Judge.

This is an action for recovery of death benefits of a National Service Life Insurance contract between the United States and Harold Dyke, now deceased. Viola Dyke was originally the designated principal beneficiary. Willie Mae Keaton Dyke is the substituted principal beneficiary, Betty Sue Dyke, daughter of the insured, being the substituted contingent beneficiary. The action was commenced against Willie Mae Keaton Dyke and the United States of America. The Government has assumed the role of stakeholder and impleaded the child, Betty Sue Dyke.

Plaintiff seeks recovery in alternative capacities, namely, as administratrix of the estate of the insured, or as beneficiary of the insurance contract. She alleges, and it is admitted by the Government, that the insurance contract was entered into on December 1, 1942, and that the insurance was in force at the time of the insured's death.

By first alternative, plaintiff seeks to recover the insurance as administratrix of the insured's estate.

■ She alleges and the Government admits that she was named principal beneficiary when the policy was granted. The Government says the principal beneficiary, Viola Albright Dyke, was the mother of the insured, and that the contingent beneficiary was Loretta Dyke Miller, described as sister of the insured. 38 U.S.C.A. § 802(u) provides for payment of benefits to the estate of the insured, but only where the beneficiary not entitled to a lump sum payment dies after the insured dies. Here the named beneficiary is living. There is, therefore, no statutory authority for payment to plaintiff as administratrix. The Government says the insured changed the principal beneficiary to his wife, Willie Mae Keaton Dyke. Willie Mae also is living. So is the new contingent beneficiary, Betty Sue Dyke.

Plaintiff, accordingly, would not be entitled to recover as administratrix.

In the alternative, plaintiff seeks to recover as principal beneficiary. The case she alleges is, that on February 26, 1946, the insured was adjudged incompetent by the Knox County Court and the plaintiff was named guardian. The record shows that this adjudication was declared invalid by the Knox County Court on March 13, 1946. Certified copy of the order was filed as an Exhibit in the record. The order of the Knox County Court of March 13, 1946, declared the insured competent.

Plaintiff further alleges that the insured was committed by the County Judge pro-tem of Knox County to a Government institution upon the affidavits of Dr. A. Smith and Dr. Phillips on the 8th day of April, 1949. The proof shows that the insured entered the Veterans' Hospital at Murfreesboro, Tennessee, on May 12, 1949, by transfer from the Eastern State Hospital at Knoxville where he had been under treatment for about a month.

The Medical Board there pronounced him mentally competent and recommended his discharge as it was their view that he was not in need of hospital treatment. He was finally discharged from the hospital in Murfreesboro sometime in 1949.

Letters of guardianship were first issued to plaintiff by the County Court Clerk of Knox County on February 26, 1946. These letters were cancelled by order of the Court previously mentioned.

Guardianship letters were again issued to plaintiff by the County Court Clerk of Knox County in which she was designated as guardian for the insured on the 13th day of April, 1949. Plaintiff made her settlement as guardian of the insured with the County Court Clerk of Knox County and she was discharged as guardian by the County Judge of that Court by order dated September 21, 1950. The order recites that the only funds that the guardian received was one check for $389.40, which was paid over to the ward.

Plaintiff alleges that the change of beneficiary on the insurance policy on October 4, 1950, was invalid because of the insured's incompetency.

Although plaintiff makes various other charges in the complaint against Willie Mae Dyke, widow of the insured who was named as the principal beneficiary in the policy in the change of designation of beneficiary on October 4, 1950, it was agreed at the hearing by all parties that the sole issue for the determination of the Court was whether the insured was mentally competent to change the beneficiary of the policy on October 4, 1950.

A pre-trial was held in the case and an order entered January 13, 1954, in which five issues were stated. By statements of counsel prior to the introduction of proof all of these issues were eliminated except the first issue, which reads: "Was the soldier mentally competent to make a valid change of beneficiary in the insurance policy on October 4, 1950?"

On the question of the insured's incompetence, Willie Mae Keaton Dyke insists that the adjudication of incompetency by the Knox County Judge pro-tem was removed or declared invalid in 1946, long prior to the change of beneficiary. Also, that the second guardianship was dissolved by the Knox County Court on September 21, 1950, prior to the change of beneficiary. She admits in her answer that the insured spent some time in hospitals for mental cases but denies his incompetency to change the beneficiary of his insurance.

It is alleged by the Government in its answer which is filed in the nature of a cross-complaint and admitted by Willie Mae Keaton Dyke that Betty Sue Dyke, daughter of Willie Mae Dyke and the insured, was named as contingent beneficiary when the insured made the change of beneficiary on October 4, 1950.

The case was tried to the Court without a jury in which many witnesses testified during a two-day period of trial time. Plaintiff's testimony consisted of an eye, ear, nose and throat doctor, Dr. Ballou; a general practitioner who is her family physician, Dr. Moore; Dr. Hill, an aged psychiatrist of Knoxville who worked in the Eastern State Hospital, a mental hospital, for a period of 17 years; and a number of lay witnesses.

The testimony of the lay witnesses was to the effect that the insured was highly nervous and mentally abnormal on the day that he returned to his home from military service. The report of his physical examination made by the Army at the time of his discharge, dated December 4, 1945, shows his psychiatric diagnosis "normal."

The effect of Dr. Hill's testimony given in his deposition on March 15, 1954, was that the insured was not mentally able to determine the consequences of changing the beneficiary in his Government insurance policy. This conclusion of the doctor's testimony appears in the following questions and answers:

"Q. Well, could you say that he was industrially and socially incapacitated to evaluate the consequences of his action? A. My opinion is that he was.

"Q. Was he on that occasion mentally able to determine the consequences of changing the beneficiary in a $10,000.-00 Government life insurance policy? A. In my opinion he wouldn't have been; he couldn't evaluate the situation."

On February 18, 1953, Dr. Hill gave a sworn statement to a Field Examiner of the Veterans' Administration in which he stated that there was an examination of the insured made by him on the 4th day of October, 1950; that he was of the professional opinion "that he was competent on October 4, 1950, to make this beneficiary change." On the same date he signed another statement which is filed as an Exhibit in the record in which he stated that the insured was competent.

It is not necessary for the Court to weigh the testimony of Dr. Hill in the light of his conflicting statements about the mental condition of the insured in view of the medical testimony in the record based upon more extended medical examinations of the insured by other doctors.

On October 29, 1949, plaintiff took the insured to Dr. Ballou, an eye, ear, nose and throat specialist at Knoxville, for a psychiatric examination and an examination for a tonsilectomy.

Dr. Ballou advised plaintiff that he was not qualified to make a psychiatric examination. He was of the opinion that the insured suffered at that time from a severe care of psychosis and was not in proper condition for a tonsilectomy. Dr. Ballou stated that although the patient was mentally unstable, he considered him capable of evaluating things.

The lay witnesses described the insured's condition at times as starey-eyed, nervous and mentally abnormal. He was described as devoted to his mother before entering military service but mad at her after his return. He had a somewhat like attitude towards his sister but in a reduced degree. Plaintiff's mother and his sister stated that he threatened to kill them on more than one occasion. His sister and her present husband stated that he asked his sister to poison his mother on October 4, 1950, the day that the change of beneficiary in the policy was made. Also, that he asked them to move out of the house in which his mother was living so that he could burn it down with his mother in it.

A number of witnesses stated that on one or more occasions he stated he imagined the Germans were after him. This, in the main, was the conduct at times of the insured from which the lay witnesses drew their conclusions that the insured was mentally incompetent at times. Such conduct, if true, without explanation of the circumstances and conditions under which it was carried on, could induce the lay mind to believe that the one so behaving was mentally abnormal.

Dr. Peterson, a reputable and experienced psychiatrist, presently Superintendent of the Eastern State Hospital at Knoxville, a State institution that serves those who are mentally ill and which handles around 1,000 patients a year, first received the insured for treatment on April 13, 1949. He was treated in the Eastern State Hospital from that date until May 12, 1949, when he was discharged to his mother.

As previously indicated, after being discharged from the Eastern State Hospital on May 12th, he entered the Veterans' Administration Hospital in Murfreesboro, Tennessee, where he was discharged some time in 1949, as mentally competent.

He was re-admitted to the Eastern State Hospital on December 8, 1949, and escaped on December 12th of the same year. He was re-admitted to this Hospital on December 30, 1949, where he remained until January 9, 1950. During the periods he was in the Eastern State Hospital he was given thorough and careful examinations by the medical staff of that institution. He was not isolated from other patients. He was not violent. He stated to Dr. Peterson that he felt his mother wanted him to appear incompetent so he could draw a pension; that she said to him if he could have fits he would get a lot of money. He further stated that his mother had had him arrested four or five times. He also stated that he was happily married and was living happily in Kentucky with his wife when his mother had him arrested and brought back to Tennessee.

Dr. Peterson was of the opinion that the insured was a psychopathic but that he had the capacity to know what he was doing; that he was further of the opinion that his condition had not changed from when he first entered the Hospital on December 8, 1949 and the day he was discharged as competent on January 9, 1950. He stated that the insured's condition was of a character which rarely developed into insanity. He also stated that insured was antisocial in that his violations of the criminal laws did not cause him to be remorseful. Although he drank intoxicants, he was not considered an alcoholic.

Mark Monroe, an officer in the Employment Office of Knox County to assist war veterans, had four or five conversations with the insured prior to October 4, 1950, the day the change of beneficiary in the policy was made. The times he saw and talked with him during the date of the change was during the summer of 1950. On each of these occasions he came to the Service Officer's office to discuss with him his National Service Life Insurance dividend. He wanted to know about the dividend checks on his insurance policy. He was under the impression that his mother had these checks but he wanted to know for sure; that he talked with him 15 or 20 minutes on each of these occasions. On the date the change of beneficiary was made he stated to Monroe that he had been released from jail by Judge Frazier and produced a copy of the order from the Knox County Court releasing his mother as his guardian. He stated that he wanted to handle all future matters himself. He further stated that he had been advised by Judge Frazier, and possibly others, that if he could not get along with his mother he had better get out of the State in order to have peace.

He wanted the beneficiary in his insurance policy changed by substituting his wife as the principal beneficiary instead of his mother, and naming his daughter, Betty Sue Dyke, as contingent beneficiary. He gave Monroe the information contained in the answers to the questions in the usual form that is used for change or designation of beneficiary in National Service Life Insurance policies. In the opinion of Monroe, he knew he was taking the insurance from his mother and giving it to his wife and child. He talked with Monroe for about 30 minutes on this occasion. After he had signed the application for change of beneficiary, he walked to the window in Monroe's office and pointed to an old car in which his wife and child were seated and said he was going to another State and get work so that he could have peace.

In the early part of 1951, Monroe received a letter from the insured giving the insured's Detroit address and asking him about his Government insurance dividend.

From this proof the conclusion is inescapable that the insured was mentally competent at the time he changed the beneficiary of his Government insurance policy on October 4, 1950; that he knew he was eliminating his mother from the policy as beneficiary and substituting his wife as the principal beneficiary and his daughter as the contingent beneficiary.

The insured, after leaving Knoxville on October 4, 1950, went direct to Dearborn, Michigan, where he worked with the National Coal Forging Company, a steel concern, as a bolt inspector for seven months. During this time he earned wages of from $65 to $75 a week. Because of work shortage his services with the National Coal Forging Company were discontinued at the end of his seven months service. Immediately thereafter he was employed by the Chrysler-Dodge Company in Detroit, where he worked for four months continuously at a wage of from $60 to $70 per week. This plant closed down so that he was without a job in Detroit, Michigan. He moved from Detroit to Ashland, Kentucky, where he was killed by an assailant. At the time he was shot, his wife was pregnant. Since that time the child was born and is now living.

██ ██ Counsel for the defendant objected to the introduction as evidence of the reports of the doctors of the Veterans' Administration in Murfreesboro of their examination and treatment of the insured while he was in that institution. These reports are a part of the official files of the Veterans' Administration which have been turned over to the Attorney General of the United States and are now in the custody of the United States District Attorney for the Eastern District of Tennessee. The Court reserved a decision on the objection, stating that if a ruling became necessary for a decision, such ruling would be made

at the time of the decision on the merits. The Court is of the opinion that the reports are competent as evidence, as they were made by physicians and staff members of the Veterans' Hospital in Murfreesboro in the regular course of treatment of the insured and made a part of the permanent file of the Veterans' Administration that covers the case of the insured. There was no motive upon the part of the Government physicians to report other than their honest conclusions. But aside from the information that is in these reports, the Court is of the opinion that evidence, the competency of which is not questioned, is sufficient to show, and from which the Court finds, that the insured was mentally competent to make the change of beneficiary in the insurance policy that he did make on October 4, 1950.

In the case of Haynes v. Swann, 53 Tenn. 560 at page 587, the Court said: "The fact of insanity having been judicially ascertained on the 5th of October, 1845, the law presumes its continuance until his restoration to sanity, or until a lucid interval is established by evidence."

The Court has serious doubt as to whether the commitment by the Knox County Judge pro-tem of the insured to the Eastern State Hospital for treatment and the further commitment at a later date of the insured to the same institution for treatment, were sufficient to establish judicial insanity of the insured, inasmuch as the insured was never declared judicially insane by a jury of his peers. If such commitments were the equivalent to a judicial determination of insanity so as to make the rule above quoted apply to the insured in this case, the Court is of the opinion and finds as a fact that the insured was of sound mind at the time he changed the beneficiary of his Government insurance policy.

Let an order be prepared putting into effect the findings and conclusions in this memorandum.

### Supplemental Opinion.

Plaintiff Viola Dyke has filed a motion for new trial, ten separate grounds being urged in its support. The Court is of the opinion that all are without merit, except that which pertains to the applicable law, particularly with respect to the question of the insured's sanity. This subject has been ably briefed and the briefs and the statutes and court decisions referred to and quoted at length have been carefully studied. However, the Court sees no reason to change the results heretofore arrived at.

In its main opinion the Court held that an adjudication of insanity creates only a rebuttable presumption of continued insanity and found as a fact that the insured was sane at the time he changed the beneficiaries of his National Service Life Insurance policy. Admittedly this is not in accord with the recent Tennessee case of Jackson v. Van Dresser, 188 Tenn. 384, 219 S.W.2d 896, 899, where the court held that under Tennessee statutes an adjudication of insanity "is conclusive evidence, as a matter of law, of a continuation of that status until the person adjudged insane has subsequently been declared of sound mind by a decree entered pursuant to the provisions of those Code sections, * * *."

A close reading of the opinion in the Jackson case, however, indicates that the purpose of the statutes was to establish a rule of property. 188 Tenn. 384 at page 391, 219 S.W.2d 896. But rules of property under state law cannot affect disposition of insurance benefits arising under federal law. Pack v. United States, 9 Cir., 176 F.2d 770, 771. Policies of National Service Life Insurance are contracts of the United States and possess the same legal incidents as other Government contracts. Their terms are to be construed by federal and not by state law. Woodward v. United States, 8 Cir., 167 F.2d 774, 778.

A life insurance policy in which the right to name or change the beneficiary is reserved to the insured is a contract in which the insurer agrees to pay the death benefit to the beneficiary designated by the insured. If a state, by its

rule of property, could restrict that agreement to pay, the effect would be a determination by the state of who should receive the benefit. In the case of National Service Life Insurance that power, existing in the state, would supersede the federal power. That result is rejected. Hilbert v. United States, D.C. Ill., 43 F.Supp. 838; Murray v. United States, D.C.E.D.Mich., N.D., 107 F.Supp. 290; Barton v. United States, 75 F.Supp. 703; Taylor v. United States, D.C.Ark., 113 F.Supp. 143.

■ It is, of course, generally recognized that purported acts of legal significance by insane persons are void. But this contract was entered into at a time when the insured was admittedly sane, and at that time the Government agreed to pay the death benefit to the person finally designated as beneficiary. The right to change the beneficiary was reserved to the insured, and until possibility of change was ended by death, no beneficiary named in the policy acquired any interest in the proceeds. Here the person finally designated was not the one originally designated. The issue tried in the case was whether the change of designation was valid or, as alleged by plaintiff, invalid by reason of the insured's insanity. In disposing of the issue, the Court adhered to the view expressed in cases heretofore cited, namely, that the Government's agreement to pay was to be construed by federal rules. In that connection, the Court rejected the rule of conclusive presumption as to continuation of insanity and applied that of rebuttable presumption. This was a rejection of the rule of property, as declared in Jackson v. Van Dresser, 188 Tenn. 384, 219 S.W.2d 896, and adherence to the common-law rule as applied by the federal courts. This, in the Court's opinion, was the correct procedure.

An order will, accordingly, be prepared, overruling the motion for new trial.