227 F.2d 461
 Viola DYKE, Individually and as Administratrix of the Estate of Harold Dyke, Deceased, Appellant,
v.
Willie Mae Keaton DYKE, United States of America, and Betty Sue Dyke, Appellee.
 No. 12360.
 United States Court of Appeals Sixth Circuit.
 December 1, 1955.
 
 Hobart F. Atkins, Knoxville, Tenn. (Judd Acuff, Hobart F. Atkins, Knoxville, Tenn., on the brief), for appellant.
 John H. Doughty, Knoxville, Tenn. (Hodges & Doughty, Knoxville, Tenn., on the brief), for appellees.
 Before SIMONS, Chief Judge, and MARTIN and STEWART, Circuit Judges.
 MARTIN, Circuit Judge.
 
 
 1
 The issue for determination here is who is entitled to receive the death benefits of a National Service Life Insurance policy issued to a soldier who died after his discharge from Army service. The contest is between the appellant mother, originally designated as principal beneficiary, and the appellees, decedent's wife and infant daughter who were respectively the substituted principal and contingent beneficiaries of the policy. The United States is a party merely as a stakeholder.
 
 
 2
 The insured decedent was adjudged non compos mentis by the County Court of Knox County, Tennessee. On the affidavits of two doctors, he was committed to a veterans' hospital at Murfreesboro, Tennessee, after being under treatment for about a month at the Eastern State Hospital in Knoxville. Upon pronouncement by a medical board that he was mentally competent and in no need of further hospitalization, he was discharged from the Veterans' Hospital during the last part of 1949. However, the insured was never adjudged by a state court to be mentally competent.
 
 
 3
 On October 4, 1950, the insured changed the beneficiary named in his policy, making his wife principal beneficiary and his infant daughter contingent beneficiary. It was agreed by all parties upon the hearing of the cause that the sole issue for determination was whether he was mentally competent to change the beneficiary on that date. The case was tried to the United States District Judge without the intervention of a jury. Numerous witnesses testified.
 
 
 4
 The appellant mother introduced an eye, ear, nose and throat specialist, Dr. Ballou, who conceded that, when the mother brought the insured to him, he was not qualified to make a psychiatric examination. The doctor said, however, that, in his opinion at the time of the call upon him, the insured was suffering from a severe case of psychosis and was not in condition to undergo a tonsillectomy. Nevertheless, the doctor said that the patient, though mentally unstable, was, in his opinion, capable of "evaluating" things.
 
 
 5
 Dr. Hill, an aged psychiatrist, testified that the insured was not mentally capable of determining the consequences of changing the beneficiary in his National Service Life Insurance policy. It was revealed that, about a year earlier, this doctor had given a sworn statement to the Field Examiner of the Veterans' Administration in direct contradiction of his testimony at the trial, for he had expressed the professional opinion that the insured was competent on October 4, 1950, to make the change of beneficiaries which he made on that date. There was introduced also another statement by Dr. Hill, made simultaneously, that the insured was mentally competent on the October, 1950, date. The district judge accorded no weight to the testimony of Dr. Hill.
 
 
 6
 Lay witnesses testified, in effect, that when he returned home from military service the insured was highly nervous and mentally abnormal. They said that he was "starry eyed" and nervous; that he was devoted to his mother before entering military service, but angry with her upon his return; likewise, in lesser degree, he changed toward his sister. Both mother and sister testified that on more than one occasion he had threatened to kill them. Some of the witnesses stated that the insured imagined the Germans were after him. His sister and her husband said that he asked his sister to poison his mother on the date he changed the beneficiary of his policy; and that he had requested them to move out of the house in which his mother was living, so that he could burn the house down while his mother was in it.
 
 
 7
 In his opinion, D.C., 122 F.Supp. 529, the trial judge commented that such conduct, if true without explanation of the circumstances, might induce the lay mind to believe that a person so behaving was mentally abnormal; but the judge narrated testimony which led to his ultimate conclusion that the insured was mentally competent when he changed the beneficiary of his insurance policy on October 4, 1950. The testimony of the Superintendent of the State Hospital for Eastern Tennessee, Dr. Peterson, a reputable and experienced psychiatrist, was reviewed. The insured had been treated from April 13 to May 12, 1949, in the state institution headed by Dr. Peterson. After being discharged, he soon entered the Veterans' Administration Hospital at Murfreesboro, Tennessee, and was discharged therefrom sometime in 1949 as mentally competent. He was readmitted to the Eastern Tennessee State Hospital at Knoxville in December of 1949, escaped four days later; was again admitted to that hospital on December 30, 1949, and remained there until January 9, 1950.
 
 
 8
 During his residence in the Eastern Tennessee Hospital, the insured was thoroughly and carefully examined by the medical staff, and was not isolated from other patients. He was not violent. He told Dr. Peterson that his mother wanted him to appear incompetent so that he could draw a pension; he said that she told him that if he had "fits" he would get a lot of money; that his mother had caused him to be arrested four or five times; and that he was living as a happily married man in Kentucky with his wife when his mother had caused him to be arrested and brought back to Tennessee. Dr. Peterson testified that, while the insured was a psychopathic, he was capable of knowing what he was doing. He stated that the insured's condition had not changed from the time he entered the hospital on December 8, 1949, until he was discharged as competent on January 9, 1950. Although he drank intoxicants, the insured was not considered by the doctor to be an alcoholic; but he was anti-social and not remorseful over his violations of law.
 
 
 9
 Mark Monroe, an officer employed to assist war veterans in obtaining employment, had conversed with the insured on four or five occasions prior to October 4, 1950. On each of these occasions, Dyke came to the office of Monroe to discuss his National Service Life Insurance dividend checks. Dyke was under the impression that his mother had the checks, but wanted to be certain about it. He talked with Monroe fifteen or twenty minutes on each of these visits. On October 4, 1950, the date he changed the beneficiary of his policy from his mother to his wife and daughter, he had talked to Monroe for some thirty minutes, saying that he had been released from jail. He produced a copy of an order from a Knox County court releasing his mother as guardian. The insured stated that he wanted to handle all future matters himself, and that he had been advised by Judge Frazier that, if he could not get along with his mother, he had better move from Tennessee in order to have peace. He told Monroe that he wanted to substitute his wife as principal beneficiary, instead of his mother, and to name his daughter as contingent beneficiary of his government insurance policy. He furnished Monroe the information contained in the answers to the questions asked in the customary form for the change of designated beneficiaries in National Service Life Insurance policies. After signing the application for changing the beneficiaries, the insured pointed from Monroe's office window to an old car in which his wife and child were seated and said that he was going to another state to get work so that he could live in peace. In Monroe's opinion, the insured knew that he was taking his insurance away from his mother and giving it to his wife and child.
 
 
 10
 The United States District Judge commented [122 F.Supp. 534]: "From this proof the conclusion is inescapable that the insured was mentally competent at the time he changed the beneficiary of his Government insurance policy on October 4, 1950; that he knew he was eliminating his mother from the policy as beneficiary and substituting his wife as principal beneficiary and his daughter as the contingent beneficiary."
 
 
 11
 After leaving Knoxville on October 4, 1950, the insured traveled directly to Dearborn, Michigan, and obtained a job as bolt inspector with a steel concern, for which he worked seven months at wages ranging from $65 to $75 a week. He was let out on account of work shortage, but immediately obtained employment with the Chrysler-Dodge Company in Detroit and worked there at $60 to $70 per week continuously for four months. This plant closed down, leaving the insured without a job. He moved to Ashland, Kentucky, where he was shot and killed. His wife was pregnant and bore a posthumous child.
 
 
 12
 The court received in evidence reports of physicians and staff members of the Veterans' Hospital at Murfreesboro concerning the insured. The judge stated: "But aside from the information that is in these reports, the Court is of the opinion that evidence, the competency of which is not questioned, is sufficient to show, and from which the Court finds, that the insured was mentally competent to make the change of beneficiary in the insurance policy that he did make on October 4, 1950."
 
 
 13
 In a supplemental opinion overruling the motion for a new trial, District Judge Taylor conceded that the opinion of the Supreme Court of Tennessee in Jackson v. Van Dresser, 188 Tenn. 384, 392, 219 S.W.2d 896, held that under Tennessee Statutes "an adjudication of insanity `is conclusive evidence, as a matter of law, of a continuation of that status until the person adjudged insane has subsequently been declared of sound mind by a decree entered pursuant to the provisions'" of pertinent Tennessee Code sections. But the judge asserted that this decision established a Tennessee rule of property; that a rule of property under state law cannot affect the disposition of insurance benefits arising under federal law; that National Service Life Insurance policies are contracts of the United States and possess the same legal incidents as other government contracts; and that their terms must be construed by federal rather than by state law. He reasoned that, if by a rule of property a state could restrict the agreement in a National Service Life Insurance policy to pay death benefits to a named beneficiary, or the right to change from one beneficiary to another, state power would supercede federal power. Such result would not be in conformity with recognized principles of law as determined in numerous federal decisions. We think Judge Taylor was clearly right. He adhered to the principles of the federal decisions.
 
 
 14
 In Clearfield Trust Co. v. United States, 318 U.S. 363, 366, 367, 63 S.Ct. 573, 574, 87 L.Ed. 838, the Supreme Court said: "We agree with the Circuit Court of Appeals that the rule of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, does not apply to this action. The rights and duties of the United States on commercial paper which it issues are governed by federal rather than local law. When the United States disburses its funds or pays its debts, it is exercising a constitutional function or power. This check was issued for services performed under the Federal Emergency Relief Act of 1935, 49 Stat. 115, 15 U.S.C.A. §§ 721-728. The authority to issue the check had its origin in the Constitution and the statutes of the United States and was in no way dependent on the laws of Pennsylvania or of any other state. [Citing cases.] The duties imposed upon the United States and the rights acquired by it as a result of the issuance find their roots in the same federal sources. [Citing cases.] In absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards."
 
 
 15
 If federal and not state law is to be applied in respect of the rights and duties of the United States on commercial paper issued by it, interpretation of the rights and duties of the United States on insurance policies issued by it to servicemen and the rights of their beneficiaries or their substituted beneficiaries thereunder are logically governed also by federal rather than by local law. Moreover, it is important to observe that the doctrine of Erie Railroad Company v. Tompkins, supra, does not apply to this case, for the reason that, here, jurisdiction does not rest upon diversity of citizenship.
 
 
 16
 District Judge John E. Miller, in Taylor v. United States, D.C.W.D.Ark., 113 F.Supp. 143, 147, 148, has contributed a helpful opinion upon the issue of whether federal or state law governs in the determination of the sufficiency of the mental capacity of an insured under a National Service Life Insurance policy to effectuate a lawful change of beneficiary. He states that the general rule is well settled that, as to the validity and construction of such policies, federal law governs upon the question of mental capacity. His opinion cites leading cases. See Lembcke v. United States, 2 Cir., 181 F.2d 703, 706; Pack v. United States, 9 Cir., 176 F.2d 770, 771; Barton v. United States, D.C.S.D.Cal., 75 F.Supp. 703; and Hilbert v. United States, D.C.E.D.Ill., 43 F.Supp. 838, 841.
 
 
 17
 In Woodward v. United States, 8 Cir., 167 F.2d 774, 779, the United States Court of Appeals said that National Service Life Insurance policies are contracts of the United States, possessing the same legal incidents as do other government contracts, and that their validity and construction present questions of federal law. In Barton v. United States, D.C., 75 F.Supp. 703, 705, 706, it was said: "The cited provisions are persuasive that it was the purpose of Congress to provide in all details for the issuance and administration and settlement of service life insurance on a national basis, as the title of the Act implies. * * * Federal control of title to the proceeds of service insurance, both before and after payment by the Government, has been consistently recognized and enforced. * * * Had Congress intended to permit state law to control as to any beneficial interest under service insurance policies, precedent gives assurance that language appropriate to such a purpose would have been employed."
 
 
 18
 So, also, it was declared in Pack v. United States, supra, 176 F.2d 770, 771: "We see no constitutional limitation on the power of Congress to make provision as to the manner in which the Government shall contract with holders of National Service Life Insurance. These are contracts of the United States and possess the same legal incidents as other Government contracts. Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L. Ed. 1434. The validity and construction of such policies present questions of federal law. Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L. Ed. 838. Exempting of proceeds of insurance from the operation of some state laws has been held a valid exercise of congressional power. Lawrence v. Shaw, 300 U.S. 245, 57 S.Ct. 443, 81 L.Ed. 623, 108 A.L.R. 1102."
 
 
 19
 The judgment of the district court is affirmed.